## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ALBERT B. RATNER,** | ) | **CASE NO. 1:18-cv-2605** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE** |
| | ) | |
| **v.** | ) | **VERIFIED COMPLAINT FOR** |
| | ) | **TEMPORARY RESTRAINING** |
| **FOREST CITY REALTY TRUST, INC.,** | ) | **ORDER, PRELIMINARY** |
| | ) | **INJUNCTION, AND OTHER** |
| **Defendant.** | ) | **INJUNCTIVE RELIEF** |

Plaintiff Albert B. Ratner ("Ratner") brings this Verified Complaint for Injunctive Relief against defendant Forest City Realty Trust, Inc. ("Forest City" or "Company"), and states as follows:

### Preliminary Statement

1.     This action arises out of a proposed merger through which Brookfield Asset Management Inc. ("Brookfield") would acquire Forest City through a reverse triangular merger for the unfair (and, in fact, misleading) merger consideration of $25.35 per share in cash. Forest City's Board of Directors (the "Board") approved the proposed transaction after following a flawed process with fundamental and undisclosed conflicts of interest. Ultimately, a Definitive Proxy Statement (the "Proxy Statement") was filed with the Securities and Exchange Commission ("SEC") and mailed to stockholders that—on its face—included materially inaccurate information and omitted material facts in contravention of federal securities laws (including Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended) and the SEC's rules and regulations (including Rule 14a-9), thereby depriving stockholders of information that is critical to an informed decision and the meaningful exercise of their voting rights. Accordingly, the Court should enter an injunction precluding Forest City from holding the special meeting of stockholders (the "Special Meeting"), scheduled for 9:30

a.m. on November 15, 2018, or precluding a stockholder vote on the merger proposal (the "Merger Proposal") contemplated in the Agreement and Plan of Merger, dated July 30, 2018 (among Forest City, Brookfield and Brookfield's subsidiary, Antlia Merger Sub Inc.) until 30 days after such time as Forest City files with the SEC and mails to stockholders a corrected proxy statement that complies with Rule 14a-9. Five directors voted against recommending the Merger Proposal, and those directors should have role in drafting the corrected proxy statement.

2. Forest City converted into a real estate investment trust ("REIT") in 2016. As a result, the Company was under tax-related sale restrictions during a built-in-gains period that expires on December 31, 2020.

3. In August of 2017, Forest City's immediately preceding Board of Directors (the "Old Board") began a process to evaluate various strategic alternatives to enhance stockholder value during the built-in-gains period. On November 1, 2017, the Old Board members stated that they were disappointed with the number of bidders and the prices at which they indicated interested. The Old Board members, however, decided to continue the process so they could definitively determine whether there was a superior alternative to the Company's standalone plan. As part of that process, the Old Board entered into negotiations with Brookfield on January 15, 2018, regarding a potential transaction, but on March 17, 2018, the Old Board unanimously rejected Brookfield's offer of $25.00 per share. On March 22, 2018, the Old Board announced that the strategic process had concluded and that it had determined that stockholder value would be better enhanced on a standalone basis.

4. On April 16, 2018, eight new members were seated on Forest City's Board (the "New Board"). The eight new directors had no prior experience as Forest City Board members, and in some cases, they had limited or no experience in the mixed-use real estate business that

Forest City engages in.  These new Board members were nominated as a result of pressure from, and ultimately in connection with a settlement reached with two activist hedge funds—Scopia Capital Management LP ("Scopia") and Starboard Value LP ("Starboard")—that included a restructuring of the Board.  The settlement required eight of the twelve members of the Old Board to resign and allowed Scopia and Starboard to each appoint one of their executives as a director and gave them significant influence over the selection of the other new directors.  Upon information and belief, Brookfield also influenced the selection of certain of the other new directors, creating interlocks that affected the performance of those directors' legal duties, which was not disclosed.  Brookfield (upon information and belief, in coordination with Scopia and Starboard) submitted a bid for Forest City on April 16, the same day the new Board members were seated and less than one month after the Old Board had ended negotiations with Brookfield.

5.      On June 21, 2018, the New Board deadlocked 6-to-6 on whether to negotiate terms with Brookfield, with the Company's CEO David LaRue ("LaRue") voting no.  Then, on June 26, 2018, Mr. LaRue—after receiving assurances with respect to the equity-based awards and long-term-incentive cash awards of which he was the largest beneficiary but without any negotiations regarding a better price and without any discussion with the other five Board members who had voted no—changed his position and indicated that he would vote in favor of the merger.  His actions resulted in a nearly unprecedented split vote (7-5) by the board of a public company determining to proceed to negotiate a merger.  That vote occurred just over two months after the new Board members were seated, leaving the inexperienced Board with an extraordinarily short period of time to consider and comprehend Forest City's complex business and real estate holdings.

6.     The new Board members that approved the Brookfield sale appear to have failed to conduct a reasonable analysis of the merger and its alternatives.  Indeed, they could not have even become fully familiar with Forest City in the mere two months they had served as directors. As the proxy-advisory firm Institutional Shareholder Services, Inc. noted: "six of the seven directors who voted  in favor of the deal did so 66 days after having been appointed, which calls into question how they could have gained an adequate understanding of [Forest City] and its assets such that they could determine that the deal was the best available alternative."

7.     The New Board reviewed Net Asset Value ("NAV") estimates on June 1, 2018, and the **single** NAV property-by-property valuation that was included in the Proxy Statement projected a net asset value of $43.78 per share as of December 2020 (not even counting significant additional dividends that would be expected to accrue to stockholders during 2019 and 2020).  In hastily approving a merger either out of ignorance or for their own short-term interest, the New Board thus gave up $5.8 billion in stockholder value ($18.79 per share, an 80% difference), all without adequate explanation to stockholders.  The Old Board had engaged in a strategic process.  Based on that process and its significant knowledge of the Company and its assets, the Old Board had unanimously determined to discontinue discussions with  Brookfield. But the New Board—with eight new members, with limited knowledge about the Company—did not engage in any strategic process before hastily approving a merger.  Even though the June 1, 2018 NAV estimates were higher than the estimates received by the Old Board, when LaRue changed his vote he provided no explanation regarding why he did so without attempting to negotiate a higher price.  In addition, there is no evidence that the New Board spoke with any potential buyers other than Brookfield or evaluated any other strategic options to unlock stockholder value, such as refinancing Forest City's existing assets (which would have resulted

in immediate returns to stockholders) or pre-marketing and contracting for the sale of properties
(which would have locked in stockholder value).

8.      The Proxy Statement was filed with the SEC on October 12, 2018, and has a
record date of October 11, 2018.  By doing so, the New Board ensured that no one could overbid
Brookfield's price because the voting rights to approve the transaction would not be acquired by
anyone subsequently acquiring the stock.

9.      Under the Merger Proposal, the merger price would be reduced by the per-share
amount of any quarterly dividend Forest City may declare after May 18, 2018.  Based on the
information in the Proxy Statement and other information disclosed at that time—including that
Forest City's projected earnings would have yielded annual dividends of $0.72 per share for
2018, or $0.36 for the last two quarters—Mr. Ratner elected not to engage in a proxy fight.  Mr.
Ratner's opposition to the deal, however, has been consistent from the beginning.  On October
25, 2018, Mr. Ratner sent a letter to other stockholders and issued a press release commenting on
his objections.  Then, on October 30, 2018 (eighteen days after the Proxy Statement was filed
and just five days after Mr. Ratner's letter to stockholders), Forest City filed its Form 10-Q for
the third quarter of 2018, which disclosed that during the first three quarters of 2018, the
Company had net earnings attributable to stockholders of over $715 million ($2.26 per share; not
the $0.72 disclosed in the Proxy Statement), **an increase of nearly seven-fold from the same
period in the prior year.**  The Board was or should have been aware of these dramatically
improved results when the Proxy Statement was filed.  In fact, in the press release issued in
conjunction with the Third Quarter 10-Q, Mr. LaRue said that "[r]esults for the quarter and year
to date met our expectations."  But because of the deal with Brookfield, dividends distributing
these earnings could not be paid to the existing stockholders without a corresponding reduction

in the price of Brookfield's offer. In other words, the Proxy Statement failed to disclose that if the merger were approved, the stockholders would lose an additional $2.26 per share in value, money that had been earned by Forest City while they were stockholders and that would instead flow to Brookfield under the proposed transaction. The Proxy Statement fails to disclose whether when the New Board voted to approve the Merger Proposal, the New Board knew how much the stockholders would be deprived of. Had Mr. Ratner been aware of this information at the time the Proxy Statement was filed, he would have engaged in a proxy fight.

10. In short, the New Board members served their own short-term self-interests and embarked on a flawed process that led to approval of a Merger Proposal at the wrong price, at the wrong time, and that ignored Forest City's high quality assets and low-debt structure and the resulting superior value opportunities available to stockholders. In their haste, the New Board also failed to inform stockholders of material facts regarding the proposed transaction, which had the effect of undervaluing Forest City, overvaluing the benefits of the merger, and discounting alternatives. In fact, Scopia is so focused on short-term gain that it has already sold approximately 9 million shares of its stock in the Company. And while the Proxy Statement says that Scopia (owning 8.15% of the stock) and Starboard (5.63%) will vote to support the Merger Proposal with their combined 13.78% interest, Scopia no longer owns 8.15% of the Company's stock.

11. The stockholders—both the institutional investors and the parents and teachers whose retirement plans are based at least, in part, on their holdings of Forest City stock—are entitled to all material information before casting their votes, and it is imperative that this Court enjoin the merger vote until sufficient time after that information has been provided.

**The Parties**

12.     Mr. Ratner was the second-generation leader of Forest City and is its co-chairman emeritus.  He served as Forest City's Chief Executive Officer from 1975 to 1995.  Mr. Ratner is and was at all relevant times the owner of a substantial number of shares of Forest City common stock.

13.     Forest City is a Real Estate Investment Trust incorporated under Maryland law and headquartered at 127 Public Square, Suite 3100, Cleveland, Ohio 44114, and listed on the New York Stock Exchange.

**Jurisdiction and Venue**

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr. Ratner alleges violations of Section 14(a) of the Exchange Act (15 U.S.C § 78n), and Rule 14a-9 promulgated under Section 14(a) (17 C.F.R. § 240.14a-9).

15.     Venue is proper in this District because: (i) the conduct at issue took place and had an effect in this district; and (ii) Forest City maintains its principal place of business and executive offices in this District.

**Factual Allegations**

A.     **The History of Forest City.**

16.     Forest City was founded by the Ratner family as a building materials business.

17.     After initially expanding into the retail sector, Forest City began acquiring real estate and constructing residential apartments, as well as commercial retail facilities.

18.     After going public in 1960, Forest City expanded beyond the Midwest over the next several decades and transitioned its focus exclusively to the ownership, management, and development of real estate.

19.     Forest City previously had two classes of stock.  While the economics of both classes were identical, holders of Class A stock were entitled to elect 25% of the Board while holders of Class B stock were entitled to elect the remaining 75% of the Board.  The majority of Class B stock was held by members of the Ratner, Miller, and Shafran families ("RMS").

20.     On January 13, 2015, in an effort to create opportunities for enhanced stockholder value, Forest City's Old Board announced a plan to convert the Company into a REIT.  That transition was completed and effective in 2016.

21.     Because REITs are required to payout 90% of their taxable income as dividends (or else face negative tax consequences), expected dividends are an important metric of stockholder value.

22.     In February 2015, Scopia disclosed that it had acquired an interest in Forest City.

23.     During 2016 and 2017, Forest City continued to undertake efforts to eliminate factors perceived to be negatively affecting the Company's value.  This included, on June 9, 2017, reclassifying its existing dual-class capitalization structure into a single common stock structure.  This action eliminated RMS's voting control over the Company.

**B.     Forest City's Evaluation of Strategic Alternatives and
     Rejection of Brookfield Merger.**

24.     Despite the stock reclassification, there continued to be a gap between the public value of the company, on the one hand, and both the estimated NAV of its assets and the trading value of comparable companies, on the other.

25.     Around June 2017, the Old Board began exploring potential structural alternatives, including a potential sale of the Company, and in August 2017, the Old Board began a process to evaluate various strategic alternatives to enhance stockholder value.

26.     On September 11, 2017, Forest City issued a press release confirming that it had "commenced a process to consider a broad range of alternatives to enhance stockholder value, including, but not limited to, an accelerated and enhanced operating plan, structural alternatives for the Company's assets, and potential merger, acquisition or sale transactions."

27.     In connection with these efforts, 44 strategic and financial parties were contacted, including Brookfield.  Several interested parties responded indicating an interest in acquiring Forest City at prices ranging from $24.50 to $27.00 per share.  Brookfield provided an indication of interest at $25.00 to $27.00 per share.  Its indication was not contingent on Forest City ceasing to issue dividends.

28.     A number of interested parties, including Brookfield, were permitted to conduct diligence on Forest City.

29.     Beginning in November 2017, the Old Board also began developing an alternative, "standalone" plan to enhance Company value without a sale, centered on outsourcing a variety of management and back-office functions.

30.     The Old Board was disappointed by the low number of bidders and the prices at which they indicated interest.  In the end, there were really only two serious bidders.  The Board, however, decided to continue the process so they could definitively determine whether there was a superior alternative to the Company's standalone plan.

31.     On November 15, 2017, Scopia sent an unsolicited letter to the Old Board emphasizing that the Old Board should pursue a sale or similar transaction, not a standalone plan.

32.     Then, on December 12, 2017, Brookfield provided a second indication of interest in acquiring Forest City in an all cash transaction at $26.00 per share, conditioned on a 45-day exclusivity agreement.  Other parties likewise provided second indications.

33.     On January 15, 2018, the Old Board, having considered the proposals (although the Proxy Statement does not say what those proposals were), executed an exclusivity agreement with Brookfield.  Brookfield subsequently undertook additional diligence and began negotiating the terms of a merger agreement with Forest City.

34.     Shortly thereafter, in February and March of 2018, Starboard began to acquire an interest in Forest City.

35.     On March 7, 2018, Brookfield conveyed that it was willing to make a binding proposal to acquire Forest City at $24.50 per share, provided that Forest City cease issuing dividends or that the price would be reduced by the amount of such dividends.

36.     While the Old Board was considering the proposal, both Scopia and Starboard informed the Old Board that—in connection with whether a sale was approved—they were weighing the option of conducting a proxy contest to replace the entirety of the Old Board.

37.     Despite these threats, the Old Board unanimously rejected Brookfield's proposal to acquire the Company for $24.50.

38.     On March 13, 2018, Brookfield increased its bid to $25.00 per share.  The Old Board considered this proposal and, on March 17, 2018, again unanimously rejected it.  The Old Board concluded that stockholder value would be better enhanced through implementation of the "standalone" plan.

39.     On March 22, 2018, Forest City issued a press release that stated it had completed the strategic review and that stockholder value was best enhanced on a standalone basis,

concluding the nine-month process.  Therefore, all previous negotiations and agreements had ended.

**C.    Board Reconstitution in Response to Threats by Scopia and Starboard.**

40.    The Old Board took action to avoid the proxy contest threatened by Scopia and Starboard.  The Old Board and Scopia and Starboard engaged in negotiations that resulted in an agreement to a reconstituted board (the "Settlement Agreement").

41.    The Old Board approved the Settlement Agreement on March 22, 2018.

42.    Pursuant to the Settlement Agreement, all but four directors resigned.  One of the Board members permitted to remain was Mr. LaRue.

43.    In the Settlement Agreement, Starboard and Scopia were each given the right to nominate one director.

44.    In the Settlement Agreement, RMS's right to nominate directors was restricted to nominating two directors, one of whom must be independent from the Ratner family.

**D.    Reconstituted Board's Re-Evaluation of a Merger with Brookfield.**

45.    On April 16, 2018, pursuant to the Agreement, eight new Board members were appointed to the Company's twelve-member Board.  The majority of the new Board members lacked any applicable experience with the type of real estate holdings that constituted the core of Forest City's business.

46.    The very same day—April 16th—Brookfield conveyed a proposal to acquire Forest City at $24.50 per share, $0.50 less than the price that had previously been rejected by the Old Board after extensive consideration.  The Proxy Statement provides no explanation regarding why Brookfield came in at a price lower than the one that had previously been rejected by the Old Board.  Upon information and belief, Brookfield's bid was done at the urging of the

- 11 -

two activist hedge funds—Scopia and Starboard—one of whom has since sold over 9 million shares.

47.     On June 1, 2018, the New Board reviewed the offer, and compared it to significantly higher NAV estimates that valued Forest City at $43.78 per share without dividends.  The New Board rejected the offer and communicated that Brookfield should send its "best and final" offer.

48.     The New Board was not prohibited from talking with other potential bidders and has never explained to the stockholders why the New Board did not start a new strategic process to evaluate its options.  The New Board should have begun a new strategic review process to inform itself and should have hired new advisors who were not associated with the previous disappointing process.

49.     On June 6, 2018, Brookfield increased its offer to $25.25 per share.

50.     On June 15, 2018, Brookfield further increased its offer to $25.35 per share, an amount that continued to be dramatically lower than the Company's projected NAV of $43.78.

51.     Disregarding the NAV estimates, the New Board instead attempted to negotiate a higher price based on certain "positive developments" in the Company's business that were not disclosed in the Proxy Statement.  The New Board discussed these developments with Brookfield but was unable to obtain a further increase of the purchase price.  Upon information and belief, these "positive developments" have never been disclosed to the stockholders.  Indeed, one wonders whether all information given to Brookfield was disclosed to all stockholders.

52.     The New Board held multiple meetings on June 21, 2018, and was deadlocked 6-6 over whether to continue negotiations with Brookfield or to terminate the process.  The directors with the most significant and relevant retail-valuation experience accordingly to the

proxy advisory firm Institutional Shareholder Services ("ISS")—Adam Metz, the former head of international real estate at the Carlyle Group; Jamie Behar, the former managing director of Real Estate & Alternative Investments at GM Investment Management Corporation; James Ratner, who has over 40 years' experience with the Company; and Mr. LaRue—voted against the proposed transaction with Brookfield.

53. On June 26, 2018, the New Board again considered whether to proceed with the Brookfield proposal, notwithstanding that there had been no increase in Brookfield's offer price. During this vote, Mr. LaRue changed his position and voted in favor of a merger with Brookfield, breaking the prior deadlock. Mr. LaRue stated that his decision to change his vote to support the merger was contingent on receiving assurances from Brookfield with respect to the equity-based awards and long-term-incentive cash awards, of which he is the largest beneficiary. Mr. LaRue changed his vote without consulting with the other five Board members who voted against the Merger Proposal, nor did he state that he believed the NAV estimates reflected in the Proxy Statement were wrong. Yet, Mr. LaRue did not successfully negotiate a better deal for stockholders, whether through the release of dividends, a higher price, or other consideration.

54. On July 30, 2018, following negotiations over the drafting and terms of the merger agreement, the New Board—in a nearly unprecedented split vote (7-5) by the board of a public company—recommended that stockholders approve the merger.

55. In voting to approve the merger, those members of the New Board that voted yes purported to rely, in part, on "fairness" opinions issued by Lazard Freres & Co. LLC ("Lazard") and Goldman, Sachs & Co. LLC ("Goldman"). Both Lazard and Goldman were engaged under a heavily contingent fee structure dependent on a merger occurring, and their opinions (disregarding the NAV valuations) that the Merger Proposal was "fair" were a foregone conclusion. Lazard

will receive $27 million if the merger is consummated and Goldman will receive $13.3 million. Both were heavily incentivized to reach the result that they did.

56.     ISS analyzed the Merger Proposal and issued voting recommendations on November 6th.  ISS is the largest proxy advisory firm in existence and its recommendations carry significant weight.  While ISS's report recommends voting in favor of the Merger Proposal, it does so with the unusual notice that investors should exercise caution, noting "valid concerns with the approval process and transaction terms."

57.     The valid concerns noted by ISS include that the merger consideration was significantly below NAV estimates, that approval was largely supported by the newest directors, and that a merger-agreement-in-principle was reached a mere two months after eight of the twelve directors were seated.  ISS further noted that "two of the board members with the most directly-applicable real estate experience" voted against the merger.  It is highly unusual—almost unprecedented—for ISS to issue a report critical of a merger proposal that has undergone significant negotiation and board deliberation, as occurred here.

**E.     Material Misstatements and Omissions in the Proxy Statement.**

58.     On October 12, 2018, Forest City filed with the SEC the Proxy Statement related to the Merger Proposal.  A true and correct copy of the Proxy Statement is attached hereto as **Exhibit A**.

59.     Notwithstanding its obligation under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated by the SEC that its Proxy Statement not contain statements that are "false or misleading," Forest City made numerous misstatements and omitted material information from the Proxy Statement, thereby violating the specific proscriptions of Rule 14a-9 and the underlying purpose of the proxy rules:  to ensure fairness in the

solicitation of proxies and afford stockholders an informed exercise of their voting rights on the proposals for which proxies are solicited.

60.     The myriad material misstatements and omissions of material fact in the Proxy Statements include those set forth more fully below.

### *Misleading statements regarding consideration for the merger.*

61.     Forest City states in the Proxy Statement that stockholders "will be entitled to receive $25.35 per share in cash, which per share amount will be reduced by the per share amount of any quarterly cash dividend … (other than dividends declared and publicly announced on or prior to May 15, 2018)."  Indeed, the Proxy Statement repeatedly refers to the merger consideration as $25.35 per share in cash (see pages 1, 8, 15, 16, 49, 56, 58, 59, 60, 61, 65, 67, 68, 69, 71, 72, 104, and 106).

62.     The $25.35 per share amount is fundamentally misleading because Forest City knew at the time of the Proxy Statement that the closing of the merger would occur in the fourth quarter of 2018 (or later) and that **no stockholder would receive $25.35 per share** (when taking account of regular quarterly dividends foregone).

63.     The diminution of the per share merger consideration is even more acute when taking account of the announcement by Forest City that its results for the third quarter ended September 30, 2018 ("Q3 Earnings") were exceptionally strong, with $715 million of net earnings (approximately $2.62 per share).  Forest City's press release (the "Q3 Press Release") with respect to Q3 Earnings was dated October 30, 2018 (just 18 days after the date of the Proxy Statement), yet the Proxy Statement does not disclose any of this extraordinarily positive data:  instead, the Proxy Statement includes the vague and incomplete reference to "certain positive developments in our business since March 2018."  If Mr. LaRue—or other

members of the New Board—knew that the Q3 Earnings were exceptional or likely to be exceptional on July 30, when the merger approval vote occurred, that is further evidence of a flawed process and that Brookfield's price is unfair.  Regardless, Mr. LaRue—and other members of the New Board—almost certainly knew that the Q3 Earnings were exceptional or likely to be exceptional when the Proxy Statement was issued, and the omission of that information made the Proxy Statement materially misleading.  (A copy of the Q3 Press Release is attached as Exhibit B; a copy of Forest City's 10-Q for the third quarter is attached as Exhibit C.)

64.      Moreover, in the Q3 Press Release, Mr. LaRue stated that "Results of the quarter and year to date met our expectations," but the Proxy Statement fails to mention these expectations.  In fact, the Proxy Statement misleads stockholders by projecting 2018 dividends per share at $0.72 (half of which had already been issued), only 18 days before the Q3 announcement of net earnings of $2.62 per share.  As a consequence of this misstatement, stockholders are unknowingly foregoing an additional $2.62 per share of value by voting for the Merger Proposal.

65.      Mr. Ratner's October 25, 2018 open letter to stockholders urging them to reject Merger Proposal (attached as Exhibit D) is clear evidence that the Proxy Statement is misleading.  Mr. Ratner's letter argues that the effective merger consideration offered by Brookfield is only $24.99 per share, not its $25.35 bid.  In calculating the effective consideration, Mr. Ratner—like other stockholders and, indeed, the market—understood that $0.36 in dividends were expected to be issued if the merger was not approved, and so should be subtracted from Brookfield's price of $25.35.  The omission of the Q3 Earnings was thus

material to his other stockholders' consideration of the Merger Proposal, and when accounted for, reduces the merger consideration to a true price of $22.37.

66.     Taking into account the value of the Q3 Earnings alone, the merger consideration disclosed in the Proxy Statement is grossly overstated and materially misleading.

67.     The Proxy Statement (see page 15) further misleads stockholders as to how the merger consideration compares to the market price of Forest City's stock.  Astoundingly, the "market price" utilized in the Proxy Statement is the closing price on the last trading day prior to a Bloomberg News report that Brookfield was engaging in discussion to acquire the Company.  The Proxy Statement should have compared the merger consideration to the $26.20 closing price of Forest City's stock on September 11, 2017, the day that Forest City initially issued a press release that the Board had commenced a strategic process.  Additionally, the Proxy Statement should have compared the merger consideration to Forest City's net asset value per share, a metric particularly relevant for real estate investment trusts, as described on pages 60, 75, 76, 77 and 82 of the Proxy Statement.

### *Misleading statements as to the Board's "approval."*

68.     In a number of places (see pages 5, 12, 22, 26, 27, 31, 62, and 85), including on the very first page, the Proxy Statement prominently touts **in bold** the fact that the "Board recommends that you vote "FOR" the approval of the merger and the other transactions contemplated by the merger agreement."  The failure of the Proxy Statement to disclose with equal prominence, including on the first page of the Proxy Statement, the fact that five directors do not support the Merger obfuscates this key fact from stockholders and is therefore, materially misleading.

- 17 -

69.     The Proxy Statement further fails to disclose the fact that a split vote is exceedingly rare.  Accordingly, it is misleading not the likewise "bold" each reference to the 7-5 vote in the Proxy Statement.

70.     Similarly, Page 5 of the Proxy Statement includes a description of the Board's vote under the subheading "Recommendations and Reasons for the Merger."  This subheading is misleading and does not reflect that five directors voted against the Merger.  The subheading should be revised to say "Recommendations and Reasons for and Against the Merger."

71.     Further, the Proxy Statement attempts to bury the legitimate arguments against approval under misleading headings.  Page 58 of the Proxy Statement describes why five of the directors voted against the merger.  This description, however, is incorrectly located under the subheading "**Reasons for the Merger**; Views of our Directors; **Recommendations of our Board**" (emphasis added).  The description of the opposing directors should be placed under a new subheading that clearly delineates that there are directors with dissenting votes as to the merger.

*Misleading statements that attempt to present approval as foregone conclusion.*

72.     The Proxy Statement discloses total votes committed in favor of the Merger Proposal but fails to equally present total votes committed against the proposal, creating a misleading and false impression that the vote is likely to result in approval.

73.     For example, pages 11, 14 and 97 of the Proxy Statement disclose that Starboard and Scopia beneficially own, respectively, 5.63% and 8.15% of Forest City's shares, and that they have each agreed to vote for the deal.

74.     By contrast, while a reference buried on page 53 of the Proxy Statement indicates that the Ratner family and affiliated entities refused to enter into merger support

agreements to support the transaction despite the request to do so, but that same reference does not indicate that the Ratner family and affiliated entities own approximately 10% of Forest City's stock.

75.     Similarly, while the Proxy Statement states that James Ratner intends to vote against the transaction (e.g., page 14), it fails to disclose the percentage of Forest City's shares beneficially owned by him and thus fails to give equal treatment to the "no" votes as was afforded the "yes" votes.

*Misleading statement of negative consequences to Forest City of rejecting Merger Proposal.*

76.     On page 15, the Proxy Statement provides a misleading description of what happens if Forest City's stockholders do not approve the Merger Proposal.  The Proxy Statement suggests that if the stockholders do not approve the Merger Proposal, the Company may be required to pay Parent a termination fee of $261 million.  The Proxy Statement must be revised to clearly state that if the stockholders do not approve the Merger Proposal, the Company will only be required to reimburse Parent for all of its reasonable and documented out-of-pocket expenses up to a maximum of $70 million.

*Material omissions in facts and circumstances of the April 16, 2018 Brookfield bid.*

77.     Forest City states in the Proxy Statement that, on April 16, 2018, the New Board received a bid from Brookfield of $24.50 per share, notwithstanding the Old Board's earlier announcement (on March 17, 2018) that it would pursue maximizing stockholder value on a standalone basis.  The same day eight new directors were nominated to the Board pursuant to the Settlement Agreement with Scopia and Starboard.

78.     Forest City fails to disclose (i) the reasons that Brookfield would have had an interest in and incentive to make another bid, given that prior (and higher) bids had been

rejected by the Board and (ii) the communications, if any, between or among Forest City, members or prospective members of the Board, Brookfield, Scopia, Starboard, or their respective representatives regarding the odd and extraordinarily well-timed bid by Brookfield and information regarding contact between Brookfield and Board members before the meeting of the directors.

> ### *Material Omissions in facts and circumstances of the Board vote to approve the Merger Proposal, following a 6-6 deadlock and the reasons that Mr. LaRue's changed his vote.*

79.     Forest City states in the Proxy Statement that on June 21, 2018, the New Board voted to a 6-6 deadlock with respect to continuing to pursue a merger with Brookfield, including a vote "against" by Mr. LaRue.  But at a meeting of the New Board on June 26, 2018, Mr. LaRue changed his vote, resulting in the New Board voting (by an extraordinary and contentious 7-5 vote) to pursue finalization of merger documentation.  The Proxy Statement discloses that Mr. LaRue changed his vote with the expectation that (i) the Proxy Statement would have "robust disclosures" regarding the reasons that five directors voted against a merger and certain other matters and (ii) the treatment of equity and long-term incentive cash awards would be as Mr. LaRue had proposed and of which he will be the largest beneficiary.

80.     While Forest City does disclose the ugly facts set forth in the above paragraph regarding the apparent *quid pro quo* underlying Mr. LaRue's eleventh-hour vote change, it fails to disclose the communications between (i) Mr. LaRue and (ii) members or prospective members of the Board, Brookfield, Scopia, Starboard, or their respective representatives regarding the vote change, terms of the Merger Proposal, and Mr. LaRue's compensation package.

81.     The Proxy Statement does not (but should) describe the reasons why Mr. LaRue was originally opposed to the deal with Brookfield and further fails to describe with any detail

other than vague references to assurance he received, what drove him to change his mind. The Proxy Statement does not disclose what conversations Mr. LaRue had with other Board members, Scopia, and Starboard. This information is particularly vital for stockholders to evaluate in light of the fact that Mr. LaRue will receive approximately $12.6 million in connection with the Merger (as set forth on page 23 of the Proxy Statement).

### *Misleading failure to distinguish between the Old Board and New Board.*

82. According to the Proxy Statement (page 47), the Board voted unanimously to reject a $25.00 per share offer from Brookfield. Subsequently, on April 16, 2018, pursuant to a Settlement Agreement with two activist stockholders, there was a significant change to the composition of the Board, with nine of the thirteen incumbent directors leaving the Board and being replaced by eight brand new directors.

83. The Background section of the Proxy Statement is misleading because it refers throughout to actions taken by the "Board" without distinguishing between the Old Board in place before the Settlement Agreement and the reconstituted Board in place after April 16, 2018.

84. This distinction is material because the Old Board, after months of deliberations, voted unanimously to reject Brookfield's proposal, while the reconstituted Board (consisting of a significant number of activist-selected directors), voted on a sharply divided basis shortly after their nomination to proceed with negotiations with Brookfield after being in office for only two months.

### *Material misstatements and omissions regarding the limited expertise and experience of Directors in favor of Merger Proposal.*

85. On April 16, 2018, eight new directors were nominated to the Board in connection with the Settlement Agreement with Scopia and Starboard. Of these eight directors,

six voted in favor of the Merger Proposal.  Mr. Metz, the new director with the most relevant experience in the real estate sector, generally, and the asset categories relevant to Forest City's business and operations, specifically, voted against the Merger Proposal.  Nonetheless, Forest City states that the first and, presumably, most important factor in supporting the Merger Proposal was:

> our Board's knowledge of our business, operations, financial condition, earnings and prospects . . .

This statement is false and misleading as the directors with the most experience and knowledge, including James Ratner, Mr. Metz, and Ms. Behar (and originally Mr. LaRue) voted **against** the Merger Proposal.

86.     The new directors had no or little prior experience with Forest City (notwithstanding their connections through Scopia or Starboard); in some cases, the new directors had limited or no experience with a business comparable to Forest City.  Other than Mr. Metz, most of the new directors were generalists in finance and asset management. At least two of the new directors (Jerome Lande and Gavin Molinelli) were principals of Scopia or Starboard, advancing their short-term agendas for a sale transaction and quick returns that generate fees for the hedge funds with which they are affiliated.  Moreover, at least one of the new directors, although not a principal of Scopia or Starboard, had pre-existing but undisclosed business relationships with a principal of Starboard.

87.     While Forest City does disclose (in footnotes to the table on "Security Ownership of Certain Beneficial Owners") that Messrs. Lande and Molinelli have an interest in Scopia and Starboard, respectively, the Proxy Statement fails to disclose (i) the effects of those interests on the performance by these directors of their duties under Maryland law and their support for the Merger Proposal and (ii) any communications regarding the Merger Proposal between either of

Messrs. Lande or Molinelli and other members of the Board, Brookfield, Scopia, Starboard, or their respective representatives.

88. Forest City also fails to disclose (i) the striking lack of expertise of certain of the new directors and their lack of knowledge about the Company (as a result of their limited tenure) and the effects of these knowledge deficits on the ability of those directors to perform their duties under Maryland law and (ii) any communications regarding the Merger Proposal between the new directors and other members of the Board, Brookfield, Scopia, Starboard, or their respective representatives.

*Material omission regarding lack of third-party appraisals.*

89. While Forest City does disclose in the Proxy Statement the bases for the written opinions rendered by each of Lazard and Goldman, the Proxy Statement fails to disclose (i) the reasons for the decision of the New Board to forego seeking an appraisal of the value of Forest City's assets, as would be usual and customary and (ii) any communications between or among the directors, Lazard, Goldman, Brookfield, Scopia, Starboard, or their respective representatives regarding the decision to forego seeking any appraisals.

*Material omissions regarding NAV estimates and evaluation.*

90. While Forest City does disclose in the Proxy Statement selected NAV estimates, the Proxy Statement fails to disclose (i) any detailed analyses (including property-by-property valuation) underlying its cryptic, incomplete and dismissive presentation of NAV estimates and (ii) any communications between or among the directors, Lazard, Goldman, Brookfield, Scopia, Starboard, or their respective representatives regarding (i) the decision to forego more detailed analyses of NAV valuations, (ii) the disregard of NAV valuations (that are significantly higher that the proposed merger consideration) in the financial analyses of Lazard and Goldman and (iii)

the cherry-picking of the methodologies utilized in the financial analyses of Lazard and Goldman (all of those methodologies resulting in significantly lower valuations than NAV estimates).

91.     The descriptions provided with NAV estimates in the Proxy Statement are also misleading and incomplete.  Pages 58, 59 and 79 of the Proxy Statement refer to different NAV estimates prepared by management — one applying cap rates based on data from a "commercial real estate research information service" and one applying an "asset-by-asset cap rate analysis." To allow stockholders to understand these estimates and the differences between the two, the Proxy Statement should specify the commercial real estate research information service and provide the asset-by-asset cap rates used as well as their source.  The NAV estimates are significantly in excess of the merger price, and information on their calculation is material to a stockholder's decision.

92.     Similarly, page 80 of the Proxy Statement indicates that estimated net asset value per share includes projected dividends from Q3 2018 through Q4 2020, but omits the projected dividends that were used in the calculations.  The omission of such projected dividends is materially misleading to stockholders.

93.     More fundamentally, the Proxy Statement (page 76) only discloses management's estimated NAV as of March 31, 2018, and as of December 31, 2020, and inexplicably omits values for the end of 2018 and for 2019.  Forest City expects to complete the merger in the fourth quarter of 2018.  As such, the absence of year-end 2018 and 2019 estimates is materially misleading to stockholders and should be disclosed in the Proxy Statement.

94.     The Proxy Statement also misleads stockholders as to the difference between the merger price and undiscounted NAV.  The chart on page 59 of the Proxy Statement does show the percentage differences of 29.5% and 46.4%, respectively, between the merger price of $25.35

(which based on foregone dividends initially estimated to be $0.36 per share, is actually $24.99) and each of the discounted NAV per share figures of $32.84 and $37.11, but inexplicably fails to show the percentage differences between the merger price of $25.35 and each of the undiscounted amounts of $38.44 (a difference of $13.45, or 53%) and $43.78 (a difference of $18.79 or approximately 75%). When projected undiscounted dividends through 2020 of $2.25 are considered, the foregone value rises to $46.03 on an undiscounted basis, a difference of $21.04 or 84%. Omitting a calculation of the larger percentage difference between undiscounted NAV and the merger price is materially misleading, given that the other percentages are included.

95. In an attempt to justify the acceptance of a markedly lower merger price of $25.35 per share, as compared to NAV, page 55 of the Proxy Statement states that the seven directors who voted to recommend the Merger Proposal considered the risks that the ranges of the available estimates of the NAV of Forest City's assets might not be realizable now or on a future liquidation of the Company. The Proxy Statement fails to disclose, however, the amounts that stockholders could receive on a liquidation of Forest City (and the risks to realizing those amounts). The Proxy Statement further failed to disclose whether the seven directors who voted to approve the merger conducted any liquidation analysis and, if so, the results of such an analysis. Such a liquidation analysis (or a justification for why it was not undertaken) is material to a stockholder's evaluation of the fairness of the merger price as compared to the higher NAV estimates, and its omission makes the Proxy Statement materially misleading. The Proxy Statement also fails to discuss any potential options regarding pre-selling properties, pre-selling properties in pieces, or refinancing assets to lock-in stockholder gains. Nor does the

Proxy Statement disclose whether the seven directors who voted to approve the Merger Proposal considered these alternatives.

96.     Last, Page 51 of the Proxy Statement indicates that Green Street Advisors were engaged **following** the execution of the merger agreement to assist with disclosure regarding NAV estimates.  The Proxy Statement should disclose why Forest City waited until **after** the Board acted to approve the merger before retaining Green Street Advisors.

### *Undisclosed Forecasts.*

97.     Pages 51 and 52 of the Proxy Statement indicate that representatives of Brookfield were provided with updated information and forecasts about Forest City. The Proxy Statement omits the details of these forecasts and fails to disclose the specific additional information that was provided to Brookfield and whether such information was previously reviewed by the Board prior to the Board's vote on the Merger.  Such information was relevant to Brookfield's valuation and its omission—or justification for why the Board did not review the information—makes the Proxy Statement materially misleading.  The Proxy Statement fails to disclose what information was provided, why it was not given to stockholders, and whether the Company shared its valuations with Brookfield before agreeing to a final price.

### *Material omissions as to the availability of alternatives.*

98.     Page 6 of the Proxy Statement discloses that Brookfield will fund its purchase of the Company with up to $4.25 billion of debt financing. The Proxy Statement fails to disclose whether the Board conducted an analysis as to whether stockholders might be better served if Forest City engaged in a levered recapitalization in which it raised a similar level of debt, distributed the proceeds to stockholders and allowed the stockholders to retain their stock ownership of the Company.

99.     Forest City further fails to disclose that (i) debt financing (on similar or more favorable terms) is also available to Forest City, (ii) the proceeds of such borrowings could be utilized to make distributions to stockholders and (ii) based on borrowing of an aggregate of just $2 billion (less than one-half of the leverage that Brookfield will utilize) stockholders could receive [tax free] distributions of up to $7 per share

100.    Similarly deficient, the analysis performed by Lazard and Goldman for the Board (as described on pages 62 to 75) fail to include a leveraged recapitalization analysis of Forest City.

### Count I
### (Violations of § 14(a) of the 1934 Act and SEC Rule 14a-9)

101.    Mr. Ratner incorporates each and every allegation set forth above as if fully set forth here.

102.    Forest City issued the Proxy Statement with the intention of soliciting stockholder support for the Merger Proposal.  Forest City, through its directors, reviewed and authorized the dissemination of the Proxy Statement, which fails to provide significant critical information as outlined above.

103.    In so doing, Forest City made untrue statements of fact and omitted material facts necessary to make the statements contained in the Proxy Statement not misleading. Forest City, by virtue of the knowledge of its officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

104.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

105.     Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  In the exercise of reasonable care, Forest City knew or should have known that the Proxy Statement was materially misleading and omits material facts that are necessary to render it not misleading.

106.     The misrepresentations and omissions in the Proxy Statement are material insofar as stockholders will be deprived of their entitlement to cast a fully informed vote on the Merger Proposal.

107.     As a direct and proximate result of Forest City's conduct, Mr. Ratner will be irreparably harmed in that Forest City's stockholders will vote based on misinformation and may improvidently approve the Merger Proposal to Mr. Ratner's detriment.

108.     Mr. Ratner has no adequate remedy at law because any effort to calculate the difference between the value he would receive if the Merger Proposal is approved and the value he would receive in the future if the Merger Proposal is rejected is purely speculative.

## Count II
### (Request for Temporary Restraining Order and Preliminary Injunction)

109.     Mr. Ratner incorporates each and every allegation set forth above as if fully set forth here.

110.     Mr. Ratner has no mechanism at this stage, other than litigation, to prevent an unfair vote on the Merger Proposal and consummation of the merger based on a materially misleading and incomplete Proxy Statement.

111.     Mr. Ratner has a reasonable likelihood of success on the merits of his claims for multiple violations of the Exchange Act.

- 28 -

112.    Mr. Ratner will suffer irreparable harm in the absence of temporary and permanent injunctive relief in that he cannot reasonably calculate the difference in value between the Merger Proposal and any potential future transaction.

113.    Although Mr. Ratner could have theoretically taken action at the time of the issuance of the Proxy Statement to initiate a "proxy-fight," he was not aware at the time the Proxy Statement was issued of the value of Forest City's Q3 Earnings, as reported for the first time on October 30, 2018, in the Q3 Press Release.

114.    Had Mr. Ratner been fully informed of this information as of the date of the Proxy Statement, he would have taken steps to initiate a "proxy-fight."

115.    Forest City's act of keeping Mr. Ratner and the other stockholders in the dark about this information until the eve of the Special Meeting lulled Mr. Ratner into not undertaking the extraordinary measure of initiating a proxy contest.

116.    As a result, Mr. Ratner, through no fault of his own, was induced not to take such alternative actions, and thus has no adequate remedy at law.

WHEREFORE, Mr. Ratner demands judgment against Forest City, as follows:

a.    the issuance of a temporary restraining order, preliminary injunction, and permanent injunction enjoining the Special Meeting and vote on the Merger Proposal scheduled for November 15, 2018, until 30 days after such time as Forest City mails to stockholders a corrected proxy statement that complies with Rule 14a-9 and that resets the record date to the date of the mailing of the conforming proxy statement;

b.    in the event that the Merger Proposal is approved and/or consummated prior to the entry of this Court's grant of a temporary restraining order, preliminary

injunction, permanent injunction, and/or final judgment, rescinding and or unwinding it;

c.      awarding Mr. Ratner the costs of this action, including a reasonable allowance for the fees and expenses of his attorneys and experts; and

d.      granting Mr. Ratner such further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *David H. Wallace*
David H. Wallace (0037210)
*dwallace@taftlaw.com*
Michael K. Wager (0043818)
*mwager@taftlaw.com* (0043818)
Michael J. Zbiegien (0078352)
*mzbiegien@taftlaw.com*
Daniel H. Bryan (0095309)
*dbryan@taftlaw.com*
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114
Phone: (216) 241-2838
Fax: (216) 241-3707

*Attorneys for Plaintiff*
*Albert B. Ratner*

## VERIFICATION

I have read the foregoing Verified Complaint, and its statements are true to the best of my knowledge, information, and belief, based on my personal knowledge and my review of documents relating to the subject matter of the foregoing Verified Complaint.  I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 12, 2018.

_____
Albert B. Ratner

23869620